CASE NO. 24-10135

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

———————

REACH AIR MEDICAL SERVICES LLC,

*Plaintiff and Appellant,*

v.

KAISER FOUNDATION HEALTH PLAN, INC. and
C2C INNOVATIVE SOLUTIONS, INC.,

*Defendants and Appellees.*

———————

Appeal from the United States District Court
Middle District of Florida
Case No. 3:22-cv-01153
Hon. Timothy J. Corrigan

———————

**BRIEF OF APPELLEE KAISER FOUNDATION HEALTH PLAN, INC.**

———————

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Moe Keshavarzi
*mkeshavarzi@sheppardmullin.com*

333 South Hope Street, 43rd Floor
Los Angeles, CA 90071

Telephone: 213.620.1780

John F. Burns
*jburns@sheppardmullin.com*

Matthew G. Halgren
*mhalgren@sheppardmullin.com*

Megan McKisson
*mmckisson@sheppardmullin.com*

501 West Broadway, 18th Floor
San Diego, CA 92101

Telephone: 619.338.6500

*Attorneys for Defendant and Appellee*
KAISER FOUNDATION HEALTH PLAN, INC.

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1(a), Defendant and Appellee Kaiser Foundation Health Plan, Inc. provides this Certificate of Interested Persons and Corporate Disclosure Statement. The following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal:

1. Air Medical Group Holdings, LLC (Parent Company of REACH Air Medical Services LLC)

2. America's Health Insurance Plans (Amicus Curiae)

3. Barcia, Giselle (Counsel for Interested Party United States of America)

4. Burns, John F. (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

5. Burns, P.A. (Counsel for Amicus Curiae)

6. Burns, Thomas A. (Counsel for Amicus Curiae)

7. C2C Innovative Solutions, Inc. (Defendant-Appellee)

8. Capital Health Plan, Inc. (Defendant-Appellee)

9. Carlton Fields, P.A. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

10. Chang, Abraham (Counsel for Plaintiff-Appellant)

11. Cohen, Jeffreys A. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

12. Corrigan, Timothy J. (U.S. District Judge, United States District Court for the Middle District of Florida)

13. DeGory, Amelia A. (Counsel for Plaintiff-Appellant)

14. Deutsch Hunt PLLC (Counsel for Amicus Curiae)

15. Dodd, Christian Edward (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

16. Fackler, Michael T. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

17. Giboney, Pierce N. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

18. Global Medical Response, Inc. (Parent Company of Air Medical Group Holdings, LLC, which is the parent company of REACH Air Medical Services LLC)

19. Guilday Law, PA (Counsel for Defendant-Appellee Capital Health Plan, Inc.)

20. Halgren, Matthew G. (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

21. Hatch, George W. III (Counsel for Defendant-Appellee Capital Health Plan, Inc.)

22. Hickey Smith LLP (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

23. Hinshaw & Culbertson (Counsel for Defendant-Appellee Capital Health Plan, Inc.)

24. Hunt, Hyland (Counsel for Amicus Curiae)

25. Jones Day (Counsel for Plaintiff-Appellant)

26. Kaiser Foundation Health Plan, Inc. (Defendant-Appellee)

27. Keshavarzi, Mohammed (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

28. Lang, Joseph H. Jr. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

29. Lehner, Steven D. (Counsel for Defendant-Appellee Capital Health Plan, Inc.)

30. McKisson, Megan K. (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

31. Med-Trans Corporation (Plaintiff-Appellant)

32. Milam Howard Nicandri & Gillam, P.A. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

33. Nicandri, Peter E. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

34. Norton Rose Fulbright US LLP (Counsel for Plaintiff-Appellant)

35. REACH Air Medical Services, LLC (Plaintiff-Appellant)

36. Russell, Lanny (Counsel for Plaintiff-Appellant)

37. Schramek, Adam T. (Counsel for Plaintiff-Appellant)

38. Sheppard Mullin Richter & Hampton LLP (Counsel for Defendant-Appellee Kaiser Foundation Health Plan, Inc.)

39. Smith Hulsey & Busey (Counsel for Plaintiff-Appellant)

40. Smith, Ruel W. (Counsel for Defendant-Appellee Capital Health Plan, Inc.)

41. Smith, Shelby Baird (Counsel for Plaintiff-Appellant)

42. Spinner, Samuel B. (Counsel for Defendant-Appellee C2C Innovative Solutions, Inc.)

43. Taylor, Charlotte H. (Counsel for Plaintiff-Appellant)

44. TMF Health Quality Institute (Parent Company of Defendant-Appellee C2C Innovative Solutions, Inc.)

45. Toomey, Joel B. (U.S. Magistrate Judge, United States District Court for the Middle District of Florida)

46. United States of America (Interested Party)

47. Van Den Berg, Elizabeth Minor (Counsel for Defendant-Appellee Capi-tal Health Plan, Inc.)

48. Vincent, Joshua G. (Counsel for Defendant-Appellee Capital Health Plan, Inc.)

No other persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal entities are financially interested in the outcome of this case or appeal.

Dated: August 21, 2024          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By      _____
                    *s/Moe Keshavarzi*
                    MOE KESHAVARZI
                    JOHN F. BURNS
                    MATTHEW G. HALGREN
                    MEGAN MCKISSON
              Attorneys for Defendant and Appellee
                    KAISER FOUNDATION
                    HEALTH PLAN, INC.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Kaiser Foundation Health Plan, Inc. believes the decisional process would be aided by oral argument and therefore requests that the Court hear oral argument in this case.

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT...................................................................2

STATEMENT REGARDING ORAL ARGUMENT ..............................................6

TABLE OF CONTENTS.................................................................................7

TABLE OF AUTHORITIES ...........................................................................9

I.      INTRODUCTION ................................................................................14

II.     STATEMENT OF JURISDICTION .........................................................15

III.    STATEMENT OF THE ISSUES ............................................................16

IV.     STATEMENT OF THE CASE ...............................................................16

        A.      Factual Background............................................................16

        B.      Procedural History.............................................................18

        C.      Standard of Review............................................................21

V.      SUMMARY OF ARGUMENT................................................................21

VI.     ARGUMENT........................................................................................23

        A.      The NSA Establishes an Arbitration Process for Resolving
                Disputes Over Payment for Air Ambulance Services and
                Narrowly Defines the Circumstances in Which an Arbitrator's
                Determination Is Subject to Review ...................................23

                1.      Congress Enacted the NSA to Correct a Market Failure
                        that Enabled Providers of Emergency Services to Extract
                        Extortionate Rates ....................................................23

                2.      The NSA Establishes the IDR Arbitration Process by
                        Which Health Plans and Providers Must Resolve Billing
                        Disputes.....................................................................24

                3.      The IDR Arbitration Process Is Designed for Efficiency
                        and Finality ...............................................................26

4.    IDR Arbitration Decisions Are Subject to Review Only in Limited Circumstances ..........................................................27

B.    REACH Fails to Plead Fraud or Undue Means with Requisite Particularity ..........................................................................30

1.    As REACH Concedes, Rule 9(b)'s Heightened Pleading Standard Applies..................................................................30

2.    REACH Does Not Allege Fraud or Undue Means with the Specificity Required by Rule 9(b) ......................................31

C.    The Statute Does Not Provide a Separate Cause of Action to Vacate IDR Determinations Based on Alleged Misrepresentations Regarding QPA Values, and REACH Has Waived Any Argument to the Contrary ...............................................40

1.    REACH Has Waived Its New Interpretation of the Statute, Which It Raises for the First Time on Appeal.............41

2.    The Applicable Regulation Provides that IDR Determinations Are Binding Absent "Intentional" Misrepresentation..................................................................43

3.    Disputes Regarding QPA Values Are Committed to the Departments, Not the Arbitrator or the Courts ........................44

4.    Subclause (I) Does Not Create a Separate Cause of Action..........................................................................45

D.    REACH's Arguments Addressing the NSA's Constitutionality Do Not Undermine the District Court's Judgment ............................48

E.    The IDR Entity Did Not Apply an Unlawful Presumption in Favor of the QPA, but Even if It Had, that Would Not Demonstrate that the IDR Entity Exceeded Its Powers ......................50

F.    As an Alternative Ground to Affirm, the Court Should Conclude that the Complaint Was Procedurally Deficient Because Vacatur of an Arbitration Award Should Be Sought by Motion, Not a Complaint ...................................................................54

VII.    CONCLUSION.................................................................................58

CERTIFICATE OF COMPLIANCE.........................................................59

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Access Now, Inc. v. Sw. Airlines Co.*
  385 F.3d 1324 (11th Cir. 2004) ..........................................................42

*Air Evac EMS, Inc. v. Cheatham*
  910 F.3d 751 (4th Cir. 2018) ..............................................................38

*Matter of Arb. Between Trans Chem. Ltd. & China Nat. Mach. Imp. & Exp. Corp.*
  978 F. Supp. 266 (S.D. Tex. 1997) ......................................................35

*Assa'ad v. U.S. Atty. Gen.*
  332 F.3d 1321 (11th Cir. 2003) ..........................................................29

*AT&T Mobility LLC v. Concepcion*
  563 U.S. 333 (2011) .............................................................................28

*Bamberger Rosenheim, Ltd. (Isr.) v. OA Dev., Inc. (U.S.)*
  862 F.3d 1284 (11th Cir. 2017) ....................................................28, 46

*Bragdon v. Abbott*
  524 U.S. 624 (1998) .............................................................................29

*Brown v. ITT Consumer Fin. Corp.*
  211 F.3d 1217 (11th Cir. 2000) ..........................................................30

*Casey v. Fla. Coastal Sch. of L., Inc.*
  2015 WL 10096084 (M.D. Fla. Aug. 11, 2015) ..................................39

*Cat Charter, LLC v. Schurtenberger*
  646 F.3d 836 (11th Cir. 2011) ............................................................28

*FHMC LLC v. Blue Cross & Blue Shield of Arizona Inc.*
  2024 WL 1461989 (D. Ariz. Apr. 4, 2024) .........................................48

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*
  500 F.3d 1276 (11th Cir. 2007) ..........................................................19

*FindWhat Inv. Grp. v. FindWhat.com*
  658 F.3d 1282 (11th Cir. 2011) ....................................................31, 33

*Floridians for Solar Choice, Inc. v. PCI Consultants, Inc.*
314 F. Supp. 3d 1346 (S.D. Fla. 2018) .........................................32, 39

*Frazier v. CitiFinancial Corp., LLC*
604 F.3d 1313 (11th Cir. 2010) ...........................................................54

*Georgia v. Public.Resource.Org, Inc.*
590 U.S. 255 (2020).............................................................................29

*GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*
2023 WL 5815821 (D.N.J. Sept. 8, 2023) ..........................................52

*GPS of New Jersey MD, P.C. v. Aetna, Inc.*
2024 WL 414042 (D.N.J. Feb. 5, 2024) .......................................53, 56

*Guardian Flight, LLC v. Aetna Health Inc.*
___ F.Supp.3d ___, 2024 WL 484561 (S.D. Tex. Jan. 5, 2024)
....................................................................................35, 39, 45, 46

*Guardian Flight LLC v. Health Care Serv. Corp.*
___ F.Supp.3d ___, 2024 WL 2786913 (N.D. Tex. May 30, 2024) .................47

*Hall St. Assocs., LLC v. Mattel, Inc.*
552 U.S. 576 (2008)......................................................................26, 57

*Hart v. Internet Wire, Inc.*
50 F. App'x 464 (2d Cir. 2002) ..........................................................34

*Hill v. Morehouse Med. Assocs., Inc.*
2003 WL 22019936 (11th Cir. Aug. 15, 2003) ..................................36

*Hopper v. Solvay Pharms., Inc.*
588 F.3d 1318 (11th Cir. 2009) ...........................................................31

*Kruse v. Sands Bros. & Co., Ltd.*
226 F. Supp. 2d 484 (S.D.N.Y. 2002) ................................................55

*In re Med/Waste, Inc.*
2000 WL 34241099 (S.D. Fla. Aug. 30, 2000) ..................................34

*Mizzaro v. Home Depot, Inc.*
544 F.3d 1230 (11th Cir. 2008) ....................................................31, 33

-10-

*In re Motors Liquidation Co.*
  2010 WL 4449425 (S.D.N.Y. Oct. 29, 2010) ................................................ 49, 50

*Nordahl Dev. Corp. v. Salomon Smith Barney*
  309 F. Supp. 2d 1257 (D. Or. 2004) .................................................................... 55

*O.R. Securities, Inc. v. Prof'l Planning Assocs., Inc.*
  857 F.2d 742 (11th Cir. 1988) ............................................... 26, 55, 56, 57

*Paladin Shipping Co. v. Star Cap. Fund, LLC*
  2014 WL 12684999 (S.D. Fla. Nov. 26, 2014) ................................................. 30

*SanMartino v. Toll Bros., Inc.*
  2010 WL 11693556 (D.R.I. Mar. 16, 2010) ...................................................... 31

*Spray Drift Task Force v. Burlington Bio-Med. Corp.*
  429 F. Supp. 2d 49 (D.D.C. 2006) ..................................................................... 56

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*
  320 U.S. 297 (1943) ........................................................................................... 50

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*
  ___ F.4th ___, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) ............................... 51

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*
  654 F. Supp. 3d 575 (E.D. Tex. 2023) ............................................................... 51

*Thomas v. Union Carbide Agr. Prod. Co.*
  473 U.S. 568 (1985) ........................................................................................... 49

*Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*
  161 F.3d 314 (5th Cir. 1998) ............................................................................. 35

*U.S. ex rel. Clausen v. Laboratory Corp. of America*
  290 F.3d 1301 (11th Cir. 2002) ......................................................................... 36

*U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs.*
  778 F. Supp. 2d 37 (D.D.C. 2011) ..................................................................... 34

*U.S. ex rel. Russell v. Epic Healthcare Mgmt. Grp.*
  193 F.3d 304 (5th Cir. 1999) ............................................................................. 37

*U.S. v. Basye*
  410 U.S. 441 (1973) ...........................................................................16

*United States v. Fla.*
  938 F.3d 1221 (11th Cir. 2019) .......................................................29

*Wagner v. First Horizon Pharm. Corp.*
  464 F.3d 1273 (11th Cir. 2006) .......................................................30

*Wallace v. Civil Aeronautics Bd.*
  755 F.2d 861 (11th Cir. 1985) .........................................................28

*White Springs Agric. Chemicals, Inc. v. Glawson Invs. Corp.*
  660 F.3d 1277, 1280 (11th Cir. 2011) ..............................................53

*Wiand v. Schneiderman*
  778 F.3d 917 (11th Cir. 2015) .........................................................54

*Wilding v. DNC Servs. Corp.*
  941 F.3d 1116 (11th Cir. 2019) .......................................................21

Statutes, Rules, and Regulations

45 C.F.R. § 149.140 ...........................................................................38

45 C.F.R. § 149.150 .............................................................38, 43, 44

7 U.S.C. § 136a ...................................................................................56

9 U.S.C. § 6 .........................................................................................54

9 U.S.C. § 10 .................................................. 19, 28, 30, 31, 32, 45, 46, 50, 51, 55

28 U.S.C. § 1291 .................................................................................15

28 U.S.C. § 1331 .................................................................................15

42 U.S.C. § 300gg-111 ........................ 15, 17, 24, 25, 26, 27, 29, 37, 40, 46, 47, 51

42 U.S.C. § 300gg-112 ............................................24, 25, 26, 34

42 U.S.C. § 300gg-135 ........................................................................24

Fed. R. App. P. 4 ..................................................................................15

Fed. R. Civ. P. 9 ................................... 14, 20, 21, 30, 31, 32, 33, 35, 37, 39, 40, 44

Fed. R. Civ. P. 12 ...........................................................................................34

Other Authorities

86 Fed. Reg. 36,872 (July 13, 2021)..............................................................23

86 Fed. Reg. 55,980 (Oct. 7, 2021)...........................................................23, 26

87 Fed. Reg. 52,618 (Aug. 26, 2022).....................................................38, 39, 45

*Federal Judicial Caseload Statistics 2023*, U.S. Courts .......................................27

H.R. Rep. No. 116-615 (Dec. 2, 2020) ..................................................23, 24, 26, 38

Merriam-Webster Dictionary .....................................................................44

*Supplemental Background on Federal Independent Dispute Resolution Public Use Files January 1, 2023 - June 30, 2023*, U.S. Department of Health and Human Services...................................................................27

## I.    INTRODUCTION

Plaintiff and Appellant REACH Air Medical Services LLC provided air transport for a patient who was a member of Defendant and Appellee Kaiser Foundation Health Plan, Inc.  REACH and Kaiser disputed the value of the transport services, and so they were required to resolve their differences via the independent dispute resolution (IDR) process established by the No Surprises Act (NSA).  When the certified arbitrator at Defendant and Appellee C2C Innovative Solutions, Inc. selected Kaiser's offer in the baseball-style arbitration, REACH filed a complaint in the district court seeking to vacate the award.

REACH alleged, among other things, that the award was procured by fraud—one of the limited bases for vacating an arbitration award under the FAA, which the NSA incorporates by reference.  The district court correctly dismissed the complaint, concluding that REACH had not alleged fraud with the particularity required by Federal Rule of Civil Procedure 9(b).  REACH focused on an alleged discrepancy in Kaiser's median contracted rates, referred to as the qualifying payment amount (QPA), for the relevant services.  These allegations, however, did not meet the high standard for fraud necessary to vacate an arbitration award.  The district court gave REACH an opportunity to amend, but REACH declined to do so.

Evidently recognizing it cannot plead fraud, on appeal REACH takes a new tack. Confronted with the statutory command that IDR arbitration determinations "shall not be subject to judicial review" unless one of the FAA's four narrow exceptions applies, 42 U.S.C. § 300gg-111(c)(5)(E)(i), REACH contends it may nevertheless pursue a "judicial action" to have the award vacated on the ground of an alleged misrepresentation. This position is legally incorrect, REACH waived it, and even if such relief were theoretically possible, REACH would not satisfy the requirements to obtain it.

Finality is one of arbitration's essential virtues. REACH cannot state a claim sufficient to overturn an IDR arbitration decision and negate this virtue with conclusory allegations. This Court should reject REACH's attempt to circumvent the statute and should affirm the district court's dismissal.

## II.    STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States. This Court has appellate jurisdiction over REACH's appeal of the district court's final judgment in favor of Kaiser and C2C pursuant to 28 U.S.C. § 1291. The district court entered judgment on December 22, 2023. REACH filed its notice of appeal on January 15, 2024. Fed. R. App. P. 4(a)(1)(A).

### III.   STATEMENT OF THE ISSUES

1.      Did REACH plead with sufficient particularity fraud or undue means in procuring the arbitration award?

2.      Can REACH avail itself of a purported separate cause of action created by the NSA to vacate IDR determinations based on alleged misrepresentations regarding the applicable QPA?

3.      Did REACH adequately plead that the IDR entity exceeded its powers?

4.      As an alternate basis to affirm, was REACH required to file a motion to vacate the arbitration award supported by evidence instead of an unverified complaint?

### IV.   STATEMENT OF THE CASE

**A.    Factual Background**

REACH is a corporation that provides air ambulance services throughout the country.  ECF 1 ¶ 7.  Kaiser is a non-profit health plan that provides comprehensive medical care and hospital services to its members.  ECF 1 ¶ 8; *U.S. v. Basye*, 410 U.S. 441, 443 (1973).

According to the complaint, on February 7, 2022 REACH provided air transport services for a Kaiser member from Santa Rosa, California to Redwood City, California, an 80-mile trip.  ECF 1 ¶ 14.  REACH is not part of Kaiser's

provider network, so the parties did not have a pre-negotiated reimbursement amount for the trip.  ECF 1 ¶ 4.  On April 21, 2022, Kaiser issued an explanation of benefits in which it stated that its allowed charge for the service was $24,813.48, and it paid that amount (less a $250 copay owed by the patient) for the claim.  ECF 1 ¶ 13.  The complaint alleges that "Kaiser represented to REACH that the amount allowed was its QPA for the claim."  ECF 1 ¶ 28.  (A QPA is meant to approximate the median rate a health plan pays its in-network providers for the services in question.  ECF 64 at 3; 42 U.S.C. § 300gg-111(a)(3)(c)(i)-(iii).)  The complaint does not provide further details regarding this representation.

REACH believed it should be paid more for its services, but the parties were unable to agree on an amount, so they proceeded to arbitration as required by the NSA.  ECF 1 ¶ 5; 42 U.S.C. § 300gg-111.  The parties were assigned to arbitrate before C2C, a medical appeals company that serves as an IDR arbitrator in disputes under the NSA.  ECF 1 ¶ 17.  In briefing before C2C, Kaiser stated its QPA for the services in question was $17,304.29.  ECF 1 ¶ 34.  In the baseball-style arbitration, Kaiser offered $24,813.48 (the amount it had already paid), and REACH offered $52,474.60.  ECF 1 ¶ 34.  After reviewing all of the evidence submitted by the parties, including the QPA, the arbitrator found that Kaiser's "offer best represents the value of the services at issue."  ECF 31-1 at 3.

Accordingly, the arbitrator selected Kaiser's offer and determined that Kaiser was the prevailing party. ECF 31-1 at 3.

## B.    Procedural History

Dissatisfied with its losses in IDR arbitrations, REACH and its affiliate entities filed several virtually identical lawsuits against health plans and IDR arbitrators each challenging an IDR decision in the health plan's favor. These lawsuits repeated similar copy-and-paste allegations: (1) accusing the health plan of securing the arbitration decision "through undue means and misrepresentations" and "bad faith" without factual support;[1] (2) characterizing the IDR arbitrator as "partial[]" without facts to demonstrate its supposed bias;[2] and (3) attempting to litigate the health plan's QPA calculation,[3] an issue the arbitrator is not permitted to decide in an IDR dispute. *Infra* Parts VI.B.2, VI.C.3.

As of late 2023, two of the lawsuits remained pending in the Middle District of Florida: this case against Kaiser and C2C, and a related case against Capital

---

[1]  ECF 1 ¶ 37; *cf. Med-Trans Corp. v. Capital Health Plan et al.* ("*Capital Health*"), 3:22-cv-1077 (M.D. Fla.), Dkt. No. 1 ¶ 36; *Med-Trans v. Blue Cross and Blue Shield of Florida et al.* ("*Blue Cross*"), 3:22-cv-01139 (M.D. Fla.), Dkt. No. 1 ¶ 45; *Guardian Flight LLC v. Aetna Health Inc. et al.* ("*Aetna*"), 4:22-cv-03805 (S.D. Tex.), Dkt. No. 1 ¶ 35.

[2]  ECF 1 ¶ 38; *cf. Capital Health*, 3:22-cv-1077, Dkt. No. 1 ¶ 37; *Blue Cross*, 3:22-cv-01139, Dkt. No. 1 ¶ 46; *Aetna*, 4:22-cv-03805, Dkt. No. 1 ¶ 36.

[3]  ECF 1 ¶ 32; *cf. Capital Health*, 3:22-cv-1077, Dkt. No. 1 ¶ 33; *Blue Cross*, 3:22-cv-01139, Dkt. No. 1 ¶¶ 40-42; *Aetna*, 4:22-cv-03805, Dkt. No. 1 ¶ 30.

Health and C2C.  ECF 64 at 8.  In this case, Kaiser and C2C separately moved to dismiss.  ECF 19; ECF 30.  Kaiser argued that the complaint was procedurally defective because an arbitration award must be challenged by a motion to vacate rather than a complaint.  ECF 30 at 16-18.  Kaiser also argued that REACH failed to plead facts that would support vacating an arbitration award under 9 U.S.C. § 10(a)(1)-(4), which the NSA states are the exclusive bases for judicial review of IDR decisions.  ECF 30 at 19-29.[4]  In particular, Kaiser explained that the alleged discrepancy in its QPA was not a sufficient basis to vacate the arbitration award. ECF 30 at 20-23.  For its part, C2C argued that it was entitled to arbitrator's immunity and that there was no case or controversy between it and REACH.  ECF 19 at 5-11.

The parties completed full briefing, the district court held a hearing, and then with the court's permission REACH and Kaiser each filed supplemental briefs. ECF 25, 37, 45, 52, 57.  America's Health Insurance Plans filed an amicus brief in

---

[4]  With its motion to dismiss, Kaiser also submitted a copy of the IDR decision that REACH was challenging.  ECF 31.  The decision forms the basis of REACH's case, and excerpts from the decision are quoted and referenced repeatedly in the complaint. *See, e.g.*, ECF 1 ¶¶ 1, 6, 36-38, 41.  Documents that are referenced in or are integral to a complaint may be considered by the court on a motion to dismiss. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (allowing a court to consider a document "refer[red] to" by a plaintiff "in its complaint," if "the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss").

support of Kaiser's motion to dismiss, which the court accepted.  ECF 48; ECF 48-1; ECF 64 at 21.  The federal government submitted a statement of interest providing an overview of the NSA process and explaining why IDR entities like C2C are not proper parties to proceedings challenging arbitration awards.  ECF 58.

In ruling on the motions, the district court first concluded that REACH was permitted to challenge the arbitration award via a complaint and was not required to bring a motion to vacate.  ECF 64 at 10-14.  It then determined that REACH's concerns about the QPA sounded in fraud and were not adequately pleaded under Rule 9(b)'s particularity requirement so as to support vacating the arbitration award.  ECF 64 at 19.  The district court granted REACH leave to amend its complaint (as to Kaiser), as REACH had requested.  ECF 37 at 19; ECF 64 at 20.  The district court also concluded that an IDR entity like C2C is not a proper party to a case challenging an NSA arbitration award, and it dismissed REACH's claims against C2C with prejudice.  ECF 64 at 20.

REACH then declined the opportunity to amend and filed a notice of its intent to stand on its complaint.  ECF 65.  The court entered final judgment in favor of Kaiser and C2C, and REACH appealed.  ECF 70; ECF 71.

While this appeal was pending, this Court granted REACH's motion to consolidate the appeal with REACH's affiliate's related appeal against Capital Health.  Dkt. No. 20.  The affiliate subsequently settled with Capital Health, and

the Court granted the affiliate's motion to voluntarily dismiss the related appeal. Dkt. No. 40.

## C.    Standard of Review

This Court reviews de novo a district court's order granting a motion to dismiss. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019).  It "may affirm the district court's order of dismissal on any ground supported by the record." *Id.*

## V.    SUMMARY OF ARGUMENT

Congress enacted the NSA to ensure that patients would be protected from surprise bills for out-of-network emergency services, and to provide an efficient IDR mechanism for providers and health plans to resolve payment disputes.  A key method for achieving that efficiency is to discourage a proliferation of litigation by limiting the bases on which an IDR arbitration award may be challenged in court to the four narrow grounds provided in the FAA.

REACH argues that Kaiser committed fraud in reporting its QPA.  Fraud is a basis for vacating an arbitration award under the FAA, but REACH's complaint does not allege this circumstance with the particularity that Rule 9(b) requires for allegations of fraud.  REACH argues that the pleading standards should be relaxed, but the standards are there for a reason, and REACH does not meet them.

-21-

Contrary to REACH's new position on appeal—which REACH waived by failing to raise in the district court—the statute does not provide a separate cause of action for vacating an arbitration award where a party alleges a misrepresentation. The Court should not entertain REACH's bid to undercut the limited grounds Congress established for reviewing an award under the NSA.

REACH also contends that the IDR entity exceeded its authority by applying an "illegal presumption" that a health plan's QPA would represent the correct value of the service. There is no evidence the arbitrator in this case employed such a presumption, arbitrators may weigh the QPA and other factors however they consider reasonable, and, regardless, this sort of purported legal error does not amount to an arbitrator exceeding its authority.

Finally, as an alternative ground to affirm, REACH should have sought to vacate the arbitration award by motion, not by filing a complaint. This procedure matters because it impacts the parties' burdens and the shape of litigation. Importantly, a motion requires evidence from the outset, whereas a complaint merely contains allegations. A proceeding such as this has the potential to escalate into full-fledged litigation, which is not what Congress intended when it established the highly efficient NSA arbitration process.

Accordingly, this Court should affirm.

## VI.   ARGUMENT

**A.   The NSA Establishes an Arbitration Process for Resolving Disputes Over Payment for Air Ambulance Services and Narrowly Defines the Circumstances in Which an Arbitrator's Determination Is Subject to Review**

### 1.   Congress Enacted the NSA to Correct a Market Failure that Enabled Providers of Emergency Services to Extract Extortionate Rates

For services where patients cannot choose a provider in advance—like emergency air ambulance services—providers lack the incentive to enter negotiated contracts to join health plans' networks.  H.R. Rep. No. 116-615, pt. I, at 53 (Dec. 2, 2020).  By remaining "out-of-network," these providers can charge "highly inflated payment rates."  *Id.*  And before the NSA, if health plans did not pay the inflated charges in full, the provider could bill the patient directly for any remaining amounts not paid by the health plan through what is called a "surprise" or "balance" bill.  *Id.* at 51; 86 Fed. Reg. 36,872, 36,874 (July 13, 2021).  The threat of surprise bills enabled providers to coerce health plans to pay above-market rates for services, or risk members being dragged into billing disputes at tremendous individual expense.  *Id.* at 36,874, 36,924 & n.130.  Recognizing this market reality as a potential financial boon, private equity groups "center[ed] on risky investments with short-term horizons" began to take over the air ambulance industry, causing charges to soar even higher.  86 Fed. Reg. 55,980, 56,046 (Oct. 7, 2021).

Congress enacted the NSA to address this "market failure" that had enabled providers to extract extortionate rates. H.R. Rep. No. 116-615, pt. I, at 53. The NSA prohibits providers from attempting to collect billed charges not paid by the health plan from patients. 42 U.S.C. § 300gg-135. Rather, providers must look to health plans to pay for services, and the statute sets out a process for resolving any disputes. 42 U.S.C. § 300gg-112.

### 2.    The NSA Establishes the IDR Arbitration Process by Which Health Plans and Providers Must Resolve Billing Disputes

Under the NSA, a health plan must first either pay or deny a claim within 30 calendar days of bill transmittal. 42 U.S.C. § 300gg-112(a)(3)(A)-(B). Upon payment, the provider has 30 days to initiate the "open negotiation period" to try to resolve informally any dispute over the initial payment amount on the claim. 42 U.S.C. § 300gg-112(b)(1)(A). If negotiations fail, the provider may initiate IDR arbitration with an arbitrator certified for participation in the program. 42 U.S.C. § 300gg-112(b)(1)(B). If arbitration is initiated, the parties each submit a proposed offer for payment of the services at issue. 42 U.S.C. § 300gg-112(b)(5)(B)(i)(I). The certified IDR arbitrator—who is often randomly appointed by the Department of Health and Human Services (HHS)—then selects between the offers to determine the final payment amount (i.e., "baseball-style" arbitration). 42 U.S.C. § 300gg-112(b)(4)(B); 42 U.S.C. § 300gg-111(c)(4)(F); 42 U.S.C. § 300gg-112(b)(5)(A)(i); ECF 1 ¶ 41. Neither party has a right to discover any of the

-24-

confidential materials submitted by the opposing party in support of its offer.  ECF 1 ¶ 18.

When selecting between offers, the IDR arbitrator is required to consider the health plan's "qualifying payment amount"—generally the median of the rates the health plan and its in-network providers in the relevant geographic area have agreed to for the services in question.  42 U.S.C. § 300gg-112(b)(5)(C)(i)(I); 42 U.S.C. § 300gg-111(a)(3)(E)(i).  Though the IDR arbitrator must consider this information, a health plan need not reimburse at its QPA, or offer an amount equal to its QPA in the IDR arbitration.  *See* 42 U.S.C. § 300gg-112(b)(5)(B)(i)(I).  Thus, a health plan may choose to pay a provider at, above, or below its QPA, or ignore it entirely—a fact that REACH acknowledges.[5]  ECF 1 ¶ 15.

---

[5] Taking the allegations in REACH's affiliate lawsuits as true, some plans reimburse providers well below their QPA.  *Capital Health*, 3:22-cv-1077, Dkt. No. 1 ¶ 4 (alleging the health plan paid 59% of its QPA).  For its part, Kaiser paid more per mile than any of the other plans that REACH and its affiliates attacked in their related lawsuits.  ECF 1 ¶¶ 1, 28, 34; ECF 31-1 at 2; *cf. Capital Health*, 3:22-cv-1077, Dkt. No. 1 ¶¶ 1, 28 (alleging Capital Health paid $16,361.54 for a 238-mile trip, versus Kaiser's $24,813.48 for an 80-mile trip); *Blue Cross*, 3:22-cv-01139, Dkt. No. 1 ¶ 43 (alleging Blue Cross paid $77.39 per mile versus Kaiser's $100.40 per mile); *Aetna*, 4:22-cv-03805, Dkt. No. 1 ¶¶ 28, 33 (alleging Aetna paid $85.04 per mile versus Kaiser's $100.40 per mile).  REACH and its affiliates tacitly acknowledge this: while they labeled the payments at issue in the other lawsuits as "improbably low," they do not make that same accusation about Kaiser's payment.  *See Blue Cross*, 3:22-cv-01139, Dkt. No. 1 ¶ 42; *Aetna*, 4:22-cv-03805, Dkt. No. 1 ¶¶ 27, 32.

### 3.    The IDR Arbitration Process Is Designed for Efficiency and Finality

Congress designed the IDR process to provide for an "efficient" and streamlined means of dispute resolution while "minimizing costs."  42 U.S.C. § 300gg-111(c)(3)(A); 42 U.S.C. § 300gg-111(c)(4)(E); *see also* H.R. Rep. No. 116-615 at 48, 58 (stating that the IDR process is structured "to reduce costs for patients and prevent inflationary effects on health care costs"); 86 Fed. Reg. 55,980, 55,996, 56,001 (Oct. 7, 2021) (emphasizing the importance of "efficiency," "predictability," and "streamlining" in the IDR process).

To advance this goal, payment amounts are determined on the papers on a condensed timeline, rather than through a lengthy and expensive trial subject to the federal rules.  *See* 42 U.S.C. § 300gg-111(c)(5); 42 U.S.C. § 300gg-112(b)(5).  For the same reasons, Congress expressly incorporated the FAA's narrow standards of judicial review into the NSA.  42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); 42 U.S.C. § 300gg-112(b)(5)(D).  The purpose of the FAA is "to relieve congestion in the courts" and to provide a "speedier and less costly" litigation alternative.  *O.R. Securities, Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 745 (11th Cir. 1988).  The FAA's limitation on judicial review is central to arbitration's "essential virtue of resolving disputes straightaway"—except in the most extreme circumstances.  *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

Following implementation of the NSA, promoting efficiency and adhering to

the statutory limitations on judicial review has become more critical than ever.

The number of IDR arbitrations has grown each quarter, and 288,810 disputes

were filed in the first half of 2023 alone.[6]  This exceeds the number of civil cases

initiated in all district courts across the country in the entire year ending March 31,

2023.[7]

### 4.    IDR Arbitration Decisions Are Subject to Review Only in Limited Circumstances

IDR arbitration determinations "*shall not* be subject to judicial review"

unless one of the FAA's four narrow exceptions applies.  42 U.S.C. § 300gg-

111(c)(5)(E)(i) (emphasis added).  These four limited bases are:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

---

[6] *Supplemental Background on Federal Independent Dispute Resolution Public Use Files January 1, 2023 - June 30, 2023*, U.S. Department of Health and Human Services, 2 (last visited Aug. 21, 2024), https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q1-2023-q2.pdf ("Between January 1, 2023 and June 30, 2023, disputing parties initiated 288,810 disputes through the Federal IDR portal.  The number of disputes initiated through the Federal IDR portal over this six-month period was 13 times greater than the Departments initially estimated the number of disputes initiated would be over the course of a full calendar year and has grown each quarter.").

[7] *Federal Judicial Caseload Statistics 2023*, U.S. Courts (last visited Aug. 21, 2024), https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2023 ("Civil case filings in the U.S. district courts dropped 8 percent (down 24,882 cases) to 284,220.").

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).  The FAA "imposes a heavy presumption in favor of confirming arbitration awards."  *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 842 (11th Cir. 2011).  Indeed, "judicial review of arbitration decisions is among the narrowest known to the law."  *Bamberger Rosenheim, Ltd. (Isr.) v. OA Dev., Inc. (U.S.)*, 862 F.3d 1284, 1286 (11th Cir. 2017).  "[R]eview under § 10 focuses on misconduct rather than mistake."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350-51 (2011).  Thus, an arbitrator's error does not warrant vacatur, unless such error was "egregious[.]"  *Wallace v. Civil Aeronautics Bd.*, 755 F.2d 861, 863 (11th Cir. 1985).

REACH argues that when Congress incorporated the grounds for review of an arbitration decision provided by 9 U.S.C. § 10(a)(1)-(4), Congress did not intend to adopt the existing caselaw interpreting that statute.  AOB 53-55.[8]  It is

---

[8]  Citations to the appellant's opening brief are to the page numbers stamped at the top of the pages by CM/ECF, not to the page numbers printed on the bottom of the pages.

well settled that when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *see also Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020) ("[W]hen Congress 'adopt[s] the language used in [an] earlier act,' we presume that Congress 'adopted also the construction given by this Court to such language, and made it a part of the enactment.'"); *Assa'ad v. U.S. Atty. Gen.*, 332 F.3d 1321, 1329 (11th Cir. 2003). This is certainly true where, as here, Congress did not merely repeat the language from the FAA, but actually incorporated the FAA provision by reference. 42 U.S.C. § 300gg-111(c)(5)(E)(i). This is not, as REACH posits, a situation where a court must speculate as to whether a statutory word is being used as a term of art. AOB 53. Rather, this involves the express incorporation of an entire statutory subsection into the new statute, and "[w]hen Congress adopts a new law that incorporates sections of a prior law, 'Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law . . . .'" *United States v. Fla.*, 938 F.3d 1221, 1228 (11th Cir. 2019).

Accordingly, as the party seeking to vacate the IDR award, REACH carries the heavy burden to establish the existence of a specific statutory ground for

vacatur.  *See Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1223 (11th Cir.

2000).  On appeal, REACH invokes the first and fourth bases for vacatur under

FAA § 10(a).  AOB 52-56, 62-64.  However, it does not carry its burden with

respect to either of these grounds.

## B.  REACH Fails to Plead Fraud or Undue Means with Requisite Particularity

REACH does not provide a sufficient basis for its allegation that the

arbitration award was procured by fraud or undue means within the meaning of 9

U.S.C. § 10(a)(1).  The district court therefore correctly determined this theory did

not support vacating the arbitration award.

### 1.  As REACH Concedes, Rule 9(b)'s Heightened Pleading Standard Applies

When a plaintiff's claims sound in fraud, the plaintiff must satisfy the

heightened pleading requirements of Rule 9(b), which requires "a party [to] state

*with particularity* the circumstances constituting fraud or mistake."  Fed. R. Civ. P.

9(b) (emphasis added).  This standard applies to all averments of fraud, whether

they are part of a claim of fraud or not.  *Wagner v. First Horizon Pharm. Corp*.,

464 F.3d 1273, 1278 (11th Cir. 2006) (holding plaintiffs must plead non-fraud

claims with particularity when those claims are based on defendants' alleged

fraudulent conduct); *Paladin Shipping Co. v. Star Cap. Fund, LLC*, 2014 WL

12684999, at *2 (S.D. Fla. Nov. 26, 2014).  Thus, REACH's allegations of fraud

must meet Rule 9(b)'s heightened pleading standard. *SanMartino v. Toll Bros., Inc.*, 2010 WL 11693556, at *6 (D.R.I. Mar. 16, 2010) (applying Rule 9(b)'s heightened standard where the plaintiff sought to vacate an arbitration award under 9 U.S.C. § 10(a)(1)). REACH concedes, as it must, that Rule 9(b)'s requirements apply in this case. AOB 47.

Rule 9(b) "requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). REACH must provide the "the who, what, when, where, and how of the allegedly false statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Failure to satisfy Rule 9(b) warrants dismissal. *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1325 (11th Cir. 2009).

## 2. REACH Does Not Allege Fraud or Undue Means with the Specificity Required by Rule 9(b)

The district court correctly concluded that REACH's allegations that Kaiser used fraud or undue means to prevail in arbitration were insufficient to withstand a motion to dismiss. ECF 64 at 19. When a party seeks to vacate an arbitration award based on fraud, the law requires "1) that 'the movant establish fraud by clear

and convincing evidence;' 2) that 'the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration;'[9] and 3) that 'the fraud materially related to an issue in the arbitration.'" *Floridians for Solar Choice, Inc. v. PCI Consultants, Inc.*, 314 F. Supp. 3d 1346, 1355 (S.D. Fla. 2018), *aff'd sub nom. Floridians for Solar Choice, Inc. v. Paparella*, 802 F. App'x 519 (11th Cir. 2020). To vacate an arbitration award based on "undue means," a plaintiff "must demonstrate intentional misconduct that measures equal in gravity to bribery, corruption, or physical threat to an arbitrator." *Id.* None of REACH's allegations meets these high standards with the specificity required by Rule 9(b).

REACH does not satisfy even the first of the three required elements for vacating an award based on fraud—that it "establish fraud by clear and convincing evidence." *Floridians for Solar Choice*, 314 F. Supp. 3d at 1355. The crux of REACH's fraud claim is its allegation that Kaiser cited two different QPA values. It argues: "Logic dictates that where an insurer provided two QPA representations,

---

9 REACH argues that this element shows that the caselaw interpreting the FAA standards should not apply to efforts to vacate NSA IDR arbitration awards because the IDR process does not provide a mechanism for the parties to review each other's pleadings and discover fraud therein. AOB 54. To the contrary, while the procedures provided by the IDR arbitration may influence what the party should have discovered upon the exercise of due diligence, that does not mean that the Court should disregard the robust caselaw applying section 10(a) of the FAA— which section Congress expressly incorporated into the NSA. *Supra* Part VI.A.4.

at least one was false." AOB 51. However, the complaint does not plead with sufficient particularity the facts leading to that deduction.

The complaint alleges:

> On April 21, 2022, Kaiser issued an EOB for the California transport. It "allowed" $24,813.48 and paid the claim accordingly (minus a $250.00 copay). The charges were coded as "claim paid at allowed amount." There was no explanation of why/how the amount was selected. Kaiser represented to REACH that the amount allowed was its QPA for the claim.

ECF 1 ¶ 28. The key portion of this allegation is the final sentence, that "Kaiser represented to REACH that the amount allowed was its QPA for the claim." But REACH does not provide the "the who, what, when, where, and how." *Mizzaro*, 544 F.3d at 1237. The vague allegation that Kaiser "represented" that the allowed amount was its QPA does not set forth "precisely what statements or omissions were made in which documents or oral representations." *FindWhat*, 658 F.3d at 1296. It does not set forth "the time and place of each such statement and the person responsible for making . . . them." *Id.* And it does not set forth "the content of such statements." *Id.* The complaint thus fails to plead three of the four categories of information required by Rule 9(b), *id.*, and this is all information that should be in REACH's possession. This failure matters because, among other reasons, it is more difficult to assess whether a purportedly false statement is fraudulent or inadvertent without all of the details.

-33-

REACH cannot remedy this omission by citing the mere fact that Kaiser originally paid an amount higher than the QPA it reported to the arbitrator. As REACH admits, health plans need not reimburse providers—or submit offers—at their QPA. *See* ECF 1 ¶ 15. The QPA is simply a data point that IDR arbitrators consider when determining an appropriate payment amount. 42 U.S.C. § 300gg-112(b)(5)(C)(i)(I). Accordingly, the amount a health plan pays on a bill does not itself constitute a representation about its QPA.

Even if REACH had adequately pleaded the basis for its belief that there was a misstatement, it also failed to allege facts demonstrating that the alleged misstatement was intentional. An inadvertent error does not amount to fraud. *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs.,* 778 F. Supp. 2d 37, 50 (D.D.C. 2011) (recognizing the difference between "inadvertent errors" and fraud); *Hart v. Internet Wire, Inc*., 50 F. App'x 464, 466 (2d Cir. 2002) (affirming dismissal under Rule 12(b)(6) because "[a]t most, plaintiffs have alleged errors and omissions—such as failure to detect or investigate typing errors, inconsistencies of naming, and other supposed signs of the Release's inauthenticity—that suggest carelessness or haste"); *In re Med/Waste, Inc*., 2000 WL 34241099, at *8 (S.D. Fla. Aug. 30, 2000) (granting motion to dismiss because allegation of accounting errors—even serious ones—are not sufficient to plead fraud). Thus, on facts similar to those alleged here, in a case also involving REACH and its affiliates,

another court ruled that REACH had not alleged fraud sufficient to vacate the arbitration award because REACH's allegations "do not rise to the level of suggesting that Aetna nor Kaiser engaged in immoral or illegal behavior.  And any allegations about either entity behaving in bad faith are conclusory, at best, and are not factually supported." *Guardian Flight, LLC v. Aetna Health Inc.*, ___ F.Supp.3d ___, 2024 WL 484561, at *7 (S.D. Tex. Jan. 5, 2024).

Additionally, "[f]raud requires a showing of bad faith *during the arbitration proceedings*, such as bribery, undisclosed bias of an arbitrator, or willfully destroying or withholding evidence." *Matter of Arb. Between Trans Chem. Ltd. & China Nat. Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 304 (S.D. Tex. 1997) (emphasis added), adopted by *Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*, 161 F.3d 314 (5th Cir. 1998) ("We agree with the district court's analysis of these issues and therefore adopt Parts I–V of its careful and comprehensive opinion.").  REACH posits that one of Kaiser's QPAs must have been inaccurate, but it provides no basis to conclude that the QPA submitted "during the arbitration proceedings" was the inaccurate one—much less that the submission during the arbitration was made with bad faith.

REACH argues that, while applicable, Rule 9(b)'s particularity requirement should be "relaxed" "in light of Kaiser's concealment as well as the NSA's black-

box IDR proceedings." AOB 56; *see also* AOB 50. However, the cases REACH

cites to support its relaxation theory do not show it has met its burden here.

REACH first quotes *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL

22019936 (11th Cir. Aug. 15, 2003). AOB 50. In that case, to support her claims

for fraud under the False Claims Act, the plaintiff "alleged that she observed [the

defendant's] billers, coders, and physicians alter various CPT and diagnosis codes

over the course of seven months and thus submit false claims for Medicare

reimbursement to the government." *Id.* at *4. "In addition, she supported her legal

theory with facts describing [the defendant's] billing process, the specific CPT and

diagnosis codes that were altered for each of the five billing schemes, and the

frequency of submission of each type of claim." *Id.* The court concluded that it

was not fatal to the plaintiff's claim that she did not plead the patients' names or

the exact dates the claims were submitted because doing so would have required

her to violate patient confidentiality by copying private records. *Id.* at *4 n.8.

Thus, the allegations regarding the fraudulent scheme in *Hill* were much more

detailed and conclusive than what REACH provides in its complaint, and the

details omitted in *Hill* were relatively insignificant.

In *U.S. ex rel. Clausen v. Laboratory Corp. of America*, 290 F.3d 1301,

1314 n.25 (11th Cir. 2002), also cited by REACH, the court *declined* to apply a

more lenient standard, noting that even under that standard the allegations of fraud

must still amount to more than speculation. Here, REACH has done no more than speculate that the purported discrepancy in Kaiser's QPA values was intentional and not inadvertent. And in *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999), another case cited by REACH, the court declined to relax Rule 9(b) because, even though the plaintiff alleged she did not have the information she needed, the information was possessed by other entities, such as the Healthcare Financing Administration (as CMS was formerly known). None of these cases stands for the proposition that a plaintiff satisfies Rule 9(b) by vaguely asserting that the defendant "represented" that a datum had a value different from what it subsequently reported without any basis to conclude that the alleged inconsistency was intentional.

REACH also argues that its fraud claim is buttressed by its unsupported allegation that the amount Kaiser paid and the QPA it reported to the arbitrator are lower than amounts unnamed payors reimbursed providers for out-of-network services before the NSA. AOB 51 (citing ECF 1 ¶ 32). This allegation is irrelevant. Because of the highly coercive nature of the pre-2022 air ambulance market, Congress instructed IDR arbitrators to consider the QPA—which is based on a health plan's *contracted* rates—when selecting between the parties' offers in IDR arbitration. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(l). By design, the QPA is not based on the *out-of-network* payments that providers often strong-armed health

plans into paying before the NSA.[10]  *Id.*  Nothing in the Act requires Kaiser to

reimburse providers in accordance with pre-2022 *out-of-network* rates.  *Id.*

Finally, it is not for the courts (or even the arbitrator) to assess a health

plan's QPA calculation.  REACH alleges on "information and belief," that Kaiser

misstated its QPA.  ECF 1 ¶ 37.  But as the Departments[11] made clear in their

regulations, it is not the arbitrator's role to determine or police QPA calculations:

> To the extent there is a question whether a plan . . . has complied with
> the July 2021 interim final rules' requirements for calculating the
> QPA, *it is the Departments' . . . responsibility, not the certified IDR
> entity's,* to monitor the accuracy of the plan's . . . QPA calculation
> methodology by conducting an audit . . . .

87 Fed. Reg. 52,618, 52,627 n.31 (Aug. 26, 2022) (emphasis added); *see also* 45

C.F.R. § 149.140(f); 45 C.F.R. § 149.150 (stating that a provider concerned with a

health plan's compliance can file a complaint with HHS).  It follows that this court,

likewise, is not responsible for assessing the accuracy of Kaiser's QPA calculation.

---

[10]  The Airline Deregulation Act of 1978 prevents states from regulating air
ambulance providers.  *See, e.g.*, *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751,
755 (4th Cir. 2018) (affirming district court decision that state regulation of air
ambulance billing practices was barred).  Protected by this statute, air ambulance
providers leveraged their out-of-network status to charge more for their services
than any other emergency out-of-network provider—leaving patients and health
plans with no recourse to fight back against those bills, a result that one federal
district court described as "crazy."  *See* Trans. of Sept. 27, 2017 hearing in *Scarlett
et al. v. Air Methods Corp.*, Case No. 16-CIV-2723-RBJ (D. Colo. Nov. 4, 2016).
The NSA sought to correct this situation.  *See* H.R. Rep. No. 116-615, pt. I, at 53
(Dec. 2, 2020).

[11]  HHS, the Department of Labor, and the Department of the Treasury
(collectively, the Departments) are jointly tasked with implementing the NSA.

That responsibility rests exclusively with "the Departments." 87 Fed. Reg. at 52,627 n.31. REACH's allegations regarding Kaiser's QPA are neither a question for the court to decide nor a basis vacate the IDR award. *Guardian Flight*, 2024 WL 484561, at *7 ("[T]he Departments of the Treasury, Labor, and Health and Human Services are responsible for monitoring the accuracy of the QPA calculation methodology. Thus, Plaintiffs['] complaints about the accuracy of Aetna and Kaiser's QPA calculations are better suited for the aforementioned Departments to address." (citation omitted)).

It does not appear that REACH means to allege facts distinct from its fraud theory to support its "undue means" theory. *See* AOB 55. In any event, REACH also fails to meet the undue means standard. There is simply no allegation in the complaint that "demonstrate[s] intentional misconduct that measures equal in gravity to bribery, corruption, or physical threat to an arbitrator." *Floridians for Solar Choice*, 314 F. Supp. 3d at 1355.

In sum, REACH fails to sufficiently plead fraud or undue means. Rule 9(b) is meant to discourage the "sue first, ask questions later approach" that REACH uses here. *Casey v. Fla. Coastal Sch. of L., Inc*., 2015 WL 10096084, at *9 (M.D. Fla. Aug. 11, 2015), *report and recommendation adopted*, 2015 WL 10818746 (M.D. Fla. Sept. 29, 2015). And by declining the district court's offer to amend its complaint, REACH indicated it could not cure the deficiency in its pleading.

Accordingly, the district court correctly concluded that REACH had not alleged a basis to vacate the arbitration award for fraud or undue means, and this Court should affirm.

## C.    The Statute Does Not Provide a Separate Cause of Action to Vacate IDR Determinations Based on Alleged Misrepresentations Regarding QPA Values, and REACH Has Waived Any Argument to the Contrary

On appeal, REACH leads with an argument it never raised before the district court. It focuses on 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I), which states that an IDR determination "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." REACH contends that this provision supplies an independent basis to vacate the arbitration award and that its complaint meets this standard. AOB 36-52.

The Court should not consider REACH's position because it waived the argument by failing to raise it before the district court. Moreover, as discussed above, REACH has failed to plead an intentional misrepresentation with the particularity required by Rule 9(b), so it would not be able to obtain vacatur under this provision even if it did apply. Additionally, even if this provision provided an independent ground to review arbitration awards, it would not apply to issues related to the QPA as such disputes are committed to the Departments. Finally, 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly provides the exclusive means for

judicial review under the NSA, so REACH's proposed interpretation of the statute cannot be correct.

### 1.    REACH Has Waived Its New Interpretation of the Statute, Which It Raises for the First Time on Appeal

In the district court, REACH took the position that subclause (I) (relating to misrepresentations of facts) modified the grounds for judicial review stated in subclause (II) (i.e., the grounds listed in the FAA). REACH argued: "Awards may be vacated under the FAA when secured through 'undue means.' The NSA specifically adopts the standard of 'misrepresentation of facts' as a type of undue means that will support vacatur." ECF 25 at 15 n.6; *see also* ECF 37 at 10 ("The statute includes misrepresentations to IDR entities as a form of 'undue means' . . . ."). Accordingly, REACH did not contend in the district court that subclause (I) provided an independent basis for vactur. It is therefore puzzling when, on appeal, REACH complains that "the district court concluded that [subclause] (I) does not provide an independent ground for vacatur." AOB 44-45. The district court can hardly be faulted for declining to adopt a theory that was never presented to it.

On appeal, REACH's new counsel begin their argument with an elaborate theory centered on subclause (I). AOB 36-52. Contrary to its position in the district court, when it contended that subclause (I)'s reference to "misrepresentation of facts" was a type of "undue means" for which a party could

-41-

seek judicial review under the FAA, REACH now argues that review for "misrepresentation of facts" is not "judicial review," but rather is a distinct kind of "judicial action." AOB 48. REACH now contends that the review it seeks is provided by the Administrative Procedure Act, AOB 43-44, a law it did not cite in its complaint or in any of its district court briefing.

In addition to being meritless, *see infra* Part VI.C.4, REACH's new position has been waived. "This Court has 'repeatedly held that "an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court."'" *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330-31 (11th Cir. 2004) (declining to consider new argument that "[n]either the complaint presented to the district court nor the response to the defendant's motion to dismiss relied upon").[12] "The reason for this prohibition is plain: as a court of appeals, [this Court] review[s] claims of judicial error in the trial courts." *Id.* at 1331; *see also id.* ("[T]oo often our colleagues on the district courts complain that the appellate

---

[12] There are exceptions to this rule, but REACH does not attempt to invoke any of them. The most germane exception would appear to be that "an appellate court will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice." *Access Now*, 385 F.3d at 1332. Even if the interpretation of subclause (I) is a pure question of law, for the reasons discussed *infra* Part VI.C.2-3, declining to consider REACH's argument would not result in a miscarriage of justice. *Cf. id.* at 1331 ("[T]he plaintiffs had every opportunity to raise the new theory in district court, whether in their initial complaint or in an effort to amend their complaint.").

cases about which they read were not the cases argued before them. We cannot allow Plaintiff to argue a different case from the case she presented to the district court."). Accordingly, the Court should conclude that REACH's argument with respect to subclause (I) is waived and should decline to consider it.

### 2. The Applicable Regulation Provides that IDR Determinations Are Binding Absent "Intentional" Misrepresentation

Even if subclause (I) provided an independent basis for vacatur, REACH would still be unable to satisfy the applicable standard, which requires that any misrepresentation be intentional. 45 C.F.R. § 149.510(c)(4)(vii)(A)(1).

REACH contends that, under subclause (I), "an IDR determination becomes nonbinding where there is simply a misrepresentation of fact." AOB 40. By this, REACH evidently means that it need only particularly plead facts showing that the statement was "false." AOB 50 (". . . REACH has alleged with sufficient specificity the 'who, what, when, where, and how' of Kaiser's false statements."); AOB 51 ("Logic dictates that where an insurer provided two QPA representations, at least one was false."). This, however, is not sufficient.

The regulation provides that subclause (I) applies only where a misrepresentation was "intentional." 45 C.F.R. § 149.510(c)(4)(vii)(A)(1) (providing that an IDR determination "[i]s binding upon the parties, in the absence of fraud or evidence of intentional misrepresentation of material facts presented to the certified IDR entity regarding the claim"). The regulation correctly construes

-43-

the statute because "misrepresentation" is commonly understood to refer to a

statement that is more than just incorrect.  Indeed, the dictionary defines

"misrepresent" as meaning "to give a false or misleading representation of usually

with an intent to deceive or be unfair."[13]  In its brief, REACH acknowledges that

the regulation requires a misrepresentation to be intentional, and REACH does not

challenge the regulation.  AOB 37.

An "intentional misrepresentation of material facts" is not the same thing as

simple "false statements."  *Compare* 45 C.F.R. § 149.510(c)(4)(vii)(A)(1) *with*

AOB 50.  REACH concedes that Rule 9(b) applies to its misrepresentation claim,

AOB 47, and, as discussed in detail *supra* Part VI.B, REACH failed to plead an

*intentional* misrepresentation with particularity.  Accordingly, even if subclause (I)

provided an independent ground for vacating IDR determinations in cases of

intentional misrepresentation, REACH would not have not established its

entitlement to relief under that provision.

### 3. Disputes Regarding QPA Values Are Committed to the Departments, Not the Arbitrator or the Courts

The purported misrepresentation of fact on which REACH bases its claim is

the value of Kaiser's QPA for the services in question.  It is therefore important to

remember that the Departments excluded from the arbitrator's purview any inquiry

---

[13]  *Misrepresent*, Merriam-Webster Dictionary (last visited Aug. 21, 2024), https://www.merriam-webster.com/dictionary/misrepresent.

into that value, reserving that issue for the Departments. 87 Fed. Reg. at 52,627 n.31 ("[I]t is the Departments' . . . responsibility, not the certified IDR entity's, to monitor the accuracy of the plan's . . . QPA calculation methodology by conducting an audit . . . ."). Accordingly, even if subclause (I) provided an independent basis for reviewing misrepresentations about other issues, a court is not in a position to evaluate an alleged misrepresentation regarding a health plan's QPA. *Guardian Flight*, 2024 WL 484561, at *7 ("Plaintiffs['] complaints about the accuracy of Aetna and Kaiser's QPA calculations are better suited for the aforementioned Departments to address.").

### 4.    Subclause (I) Does Not Create a Separate Cause of Action

For all of the foregoing reasons, the Court need not reach the issue of whether subclause (I) provides an independent basis for review and, if so, how that review functions. If the Court does reach this issue, however, it should reject REACH's position.

As the district court correctly explained, subclause (II) "is the final word on reviewability. It contains exclusive language—'shall not be subject to judicial review, except'—and lists § 10(a) of the FAA as supplying the only grounds for judicial review." ECF 64 at 18. This district court was not the only court persuaded by this point. As a district court in Texas explained:

> [A]s Chief Judge Corrigan wisely opined, the NSA uses exclusive
> language regarding when judicial review is permitted—only when one

of the four paragraphs in Section 10(a) of the FAA is triggered. Otherwise, judicial review is prohibited, and subsection I of Section 300gg-111(c)(5)(E)(i)(I) does not create an additional avenue for judicial review. If Congress intended to make misrepresentations of fact a type of "undue means" that triggers judicial review, it would have stated as such. Instead, the NSA clearly separates when an IDR award is binding—absent a fraudulent claim or evidence of misrepresentation of fact to the IDR entity—and when an IDR award is subject to judicial review—pursuant to Section 10(a) of the FAA. § 300gg-111(c)(5)(E)(i)(I)-(II). Thus, to the extent Plaintiffs seek judicial review of the IDR awards based on the allegations in their Complaints that Aetna and Kaiser misrepresented their respective QPAs, those arguments fail.

*Guardian Flight*, 2024 WL 484561, at *6 (citations omitted).

REACH attempts to escape this problem by arguing (again, for the first time on appeal) that the review afforded by subclause (I) is not "judicial review," and so it is not excluded by subclause (II). AOB 48 (attempting to distinguish between "judicial review" and "judicial action"). REACH contends that reviewing an arbitration award constitutes judicial review, while revieing the award's "inputs" does not. AOB 48-49. This theory does not square with the plain meaning of these words or the law. Actions to vacate arbitration awards are routinely referred to as "judicial review." *E.g.*, *Bamberger Rosenheim*, 862 F.3d at 1286 ("[J]udicial review of arbitration decisions is among the narrowest known to the law."). The very first basis the FAA provides for judicial review of awards is "where the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). These are clearly "inputs." Thus, the input vs. output distinction REACH seeks to draw

does not separate the judicial review afforded by subclause (II) from the review REACH seeks under subclause (I).[14]

The better reading of subclause (I) was provided by the district court in another case involving Guardian Flight.  There, the district court explained:

> To the extent Plaintiffs are arguing that the NSA creates a right and thereby a remedy, this proposition is incorrect.  Plaintiffs identify two textual provisions within the NSA to support the existence of a cause of action.  First, the NSA states that any decision by a certified IDR entity "shall be binding."  42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). . . . [T]hese provisions . . . do not suggest that Congress intended to create a procedural mechanism for providers to convert IDR awards to final judgments.  Further, there is no other language in the statute suggesting that Congress contemplated providers would be able to file a lawsuit to enforce IDR awards.  In other words, these provisions only suggest that Congress created a right, but there is nothing to suggest that Congress also intended to confer a corresponding remedy.

*Guardian Flight LLC v. Health Care Serv. Corp.*, ___ F.Supp.3d ___, 2024 WL 2786913, at *4 (N.D. Tex. May 30, 2024) (citations omitted).  The argument the provider makes in the instant case is somewhat different, but the interpretation of subclause (I) applies with equal force: in declaring when IDR determinations would be binding, Congress created at right, but it did not create a remedy pursuant to which a party can obtain review by a court; such review is provided exclusively by subclause (II).

---

[14]  REACH seems to be aware of this problem when it acknowledges that "in some cases (like here) an intentional misrepresentation of fact will satisfy both standards."  AOB 49.  It fails, however, to explain how the distinction it seeks to draw can survive this concession.

-47-

That is not to say that a provider cannot do anything when it believes a health plan is relying on an incorrect QPA or an IDR entity is unfairly adjudicating claims. A provider can "notify [CMS] about issues with the IDR process." *FHMC LLC v. Blue Cross & Blue Shield of Arizona Inc.*, 2024 WL 1461989, at *3 (D. Ariz. Apr. 4, 2024). A provider can also "report [a health plan] to CMS for their violations of the NSA." *Id.* Or a provider can petition CMS to revoke an IDR entity's certification to participate in the NSA program. ECF 58 at 22 n.7. What a provider cannot do, however, is seek judicial review on a ground beyond the exclusive grounds defined by the statute.

## D.    REACH's Arguments Addressing the NSA's Constitutionality Do Not Undermine the District Court's Judgment

REACH undertakes a lengthy discussion of due process, the gist of which seems to be that if REACH loses, then the NSA is likely unconstitutional. AOB 56-62. To be clear, REACH does not challenge the NSA as unconstitutional. Rather, it argues that a provider in its position must win to avoid constitutional concerns. AOB 56 ("[I]f a party to NSA IDR cannot obtain relief from an IDR determination where it has plausibly alleged that its adversary has misrepresented a critical fact—and won the IDR on that basis—then the scheme raises substantial constitutional concerns.").

REACH's primary concern is that arbitration under the NSA is mandatory and that a more lenient standard of review is therefore appropriate. AOB at 58.

However, the NSA is not the first statute to compel parties to resolve their disputes by arbitration.

In *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568 (1985), the Supreme Court upheld a statutory scheme in the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA") that required that disputes over compensation for data sharing be decided by arbitration. *Id*. at 573-74. The arbitration decisions were subject to judicial review only for "fraud, misrepresentation, or other misconduct." *Id*. The petitioners in *Thomas* challenged the limitation on judicial review as unconstitutional, as REACH does here. *Id.* at 582. The Supreme Court rejected the challenge. It explained that Congress "may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id*. at 593-94. "To hold otherwise," the Court emphasized, "would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures such as negotiation and arbitration with respect to rights created by a regulatory scheme." *Id.*

*In re Motors Liquidation Co.*, 2010 WL 4449425 (S.D.N.Y. Oct. 29, 2010) reached the same result. Following the bankruptcy of General Motors, Congress enacted the Dealer Arbitration Act to create an expedited, mandatory arbitration process for affected car dealers to pursue reinstatement of franchise agreements.

*Id.* at \*5.  Congress did not allow for *any* judicial review of Dealer Arbitration Act arbitration decisions.  *Id.*  Still, the court rejected the due process argument raised in *In re Motors Liquidation* over the lack of judicial review.  *Id.*; *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943) (similar result under Railway Labor Act).

REACH argues that in those cases—in which arbitration was mandatory and judicial review was limited—the underlying arbitrations had more robust procedures than what is available under the NSA.  AOB 61.  But REACH does not cite any case for its hypothesis that arbitration procedures it deems inadequate must be balanced by heightened levels of judicial review that depart from the judicial review prescribed by section 10(a) of the FAA.  The reason REACH's complaint was dismissed was that REACH failed to plead with sufficient particularity the fraud (or even intentional misrepresentation) that it alleged entitled it to vacatur.  The fact that participation in the IDR process is mandated by statute simply does not provide a basis to relieve REACH of its failure to satisfy its burden.

**E.**   **The IDR Entity Did Not Apply an Unlawful Presumption in Favor of the QPA, but Even if It Had, that Would Not Demonstrate that the IDR Entity Exceeded Its Powers**

As a separate basis for vacatur under the FAA, REACH contends that the IDR entity "exceeded its powers" by employing an "illegal presumption" that the

QPA represented the correct value of the services and then evaluating whether
other evidence submitted by the parties warranted a departure from the QPA.
AOB 62-64 (invoking 9 U.S.C. § 10(a)(4)).  REACH's argument fails for three
reasons.

First, REACH misstates the law related to use of the QPA in IDR
determinations.  "[T]he No Surprises Act unambiguously provides that arbitrators
deciding which offer to select 'shall consider . . . the qualifying payment
amounts'" and any information on "additional circumstances" provided by the
parties.  *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, ___
F.4th ___, 2024 WL 3633795, at *8 (5th Cir. Aug. 2, 2024); 42 U.S.C. § 300gg-
111(c)(5)(C).  It is true that the district court in *Texas Med. Ass'n v. United States
Dep't of Health & Hum. Servs.*, 654 F. Supp. 3d 575, 592 (E.D. Tex. 2023),
rejected a rule that applied a presumption in favor of the QPA, but the problem
with the rule was not with giving substantial weight to the QPA per se, but rather
that the rule attempted "to dictate how arbitrators assess other information—
invading the adjudicative role assigned by the statute to the arbitrators, not the
Departments."  Similarly, in affirming that decision, the Fifth Circuit held that
"when Congress charges a decisionmaker with considering several factors without
assigning them a procedural order or 'specific weight,' the weighing of those
factors is left to the decisionmaker's sound discretion."  *Texas Med. Ass'n*, 2024

WL 3633795, at *8.  Thus, while the Departments are not permitted to constrain the arbitrators' discretion on this issue, the arbitrators remain free to weigh the factors however they consider reasonable.[15]

Second, C2C's award shows that it selected the offer best representing the value of the services at issue after considering the parties' evidence, exactly as directed by statute.  Indeed, far from rejecting REACH's evidence, C2C specifically acknowledged the evidence submitted by both parties, and it concluded that Kaiser's offer "represent[ed] the value of the services at issue."  ECF 31-1 at 3.  REACH quotes the portion of the award stating that "the information submitted did not support the allowance of payment at a higher [out-of-network] rate."  AOB 63-64.  REACH infers that the arbitrator was evaluating whether the evidence supported payment at a rate "higher" than the QPA.  Read in context, however, the arbitrator was considering whether the evidence supported payment at a rate higher than what Kaiser offered.  REACH's interpretation would not make sense because both of the offers the arbitrator was choosing between were higher than the QPA.

---

[15]  At the time the arbitration award was issued on September 12, 2022, a prior version of the regulation addressing presumptions had been vacated, and a new regulation had not yet gone into effect, so the arbitrator was not constrained by any unlawful regulation.  *See GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *6 (D.N.J. Sept. 8, 2023).  In any event, REACH does not seek vacatur on the ground that the arbitrator followed regulations that were later invalidated.

Accordingly, though the arbitrator discussed the QPA, the record does not demonstrate that the arbitrator applied a presumption in favor of the QPA. *Cf. GPS of New Jersey MD, P.C. v. Aetna, Inc.*, 2024 WL 414042, at *5 (D.N.J. Feb. 5, 2024) ("[T]he Court does not presume that [an NSA arbitrator] failed to consider all of the factors, even if [the arbitrator] only specifically addressed some of them in its decision.").

Third, even assuming C2C applied a presumption in favor of the QPA (it did not), and even assuming giving greater weight to the QPA would have been impermissible (it would not have been, because arbitrators may weigh the factors however they consider reasonable), the misapplication of the law is still not a valid basis for vacating an arbitration award. The well-settled law of this circuit provides that in reviewing arbitration awards, even an "incorrect legal conclusion is not grounds for vacating or modifying the award." *White Springs Agric. Chemicals, Inc. v. Glawson Invs. Corp.*, 660 F.3d 1277, 1280 (11th Cir. 2011); *see also GPS of New Jersey v. Aetna*, 2024 WL 414042, at *5 ("[E]ven if [the NSA arbitrator] was required to consider all five factors and failed to do so, the Court agrees with Defendants that this still does not rise to the level required for the Court to vacate the arbitration award. A failure to consider required factors amounts to a mistake of law, which the Court is not at liberty to review." (footnote omitted)). Nor is an arbitrator's "manifest disregard of the law" enough to warrant

vacatur.  *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1323 (11th Cir.

2010).  Importantly, it is not the role of the court to re-weigh the evidence that was

before the arbitrator.  *See Wiand v. Schneiderman*, 778 F.3d 917, 926 (11th Cir.

2015) (finding the "entire argument for vacatur is based on the weight of the

evidence presented, [which] is simply beyond this court's—or the district court's—

power to review").  Accordingly there is no basis to vacate the arbitration award on

the ground that the IDR entity exceeded its powers.

**F.    As an Alternative Ground to Affirm, the Court Should Conclude that
the Complaint Was Procedurally Deficient Because Vacatur of an
Arbitration Award Should Be Sought by Motion, Not a Complaint**

Kaiser also moved to dismiss on the ground that REACH should have

moved to vacate the arbitration award instead of filing a complaint.  ECF 30 at 10-

12.  The district court disagreed, concluding that the portion of the FAA requiring

that an arbitration award be challenged via a motion to vacate did not apply under

the NSA.  ECF 64 at 10-14.  If the Court affirms dismissal on the grounds

discussed in the preceding sections, it need not reach this issue.  However, if the

Court does reach this issue, it should conclude that the proper mechanism for

vacating an IDR arbitration award is a motion to vacate.

The FAA clearly requires that a party who seeks to challenge an arbitration

award file a motion to vacate rather than a complaint.  9 U.S.C. § 6 ("Any

application to the court hereunder shall be made and heard in the manner provided

by law for the making and hearing of motions . . . .").  Moreover, the motion must be supported by evidence—not just allegations—demonstrating one of the four bases for vacatur set forth in 9 U.S.C. § 10(a)(1)-(4).  *See Nordahl Dev. Corp. v. Salomon Smith Barney*, 309 F. Supp. 2d 1257, 1270 (D. Or. 2004) (denying plaintiff's motion to vacate as lacking evidence justifying vacatur).  Here, REACH filed a complaint, not a motion to vacate, and failed to submit any evidence to support its complaint.  *See Kruse v. Sands Bros. & Co., Ltd*., 226 F. Supp. 2d 484, 487 (S.D.N.Y. 2002).  Thus, there is no doubt that REACH failed to comply with the standard requirements for vacating arbitration awards; the only question is whether those requirements apply to NSA arbitrations.

The district court concluded that the procedure for bringing a motion to vacate could not be imposed on parties to NSA arbitrations because the NSA does not expressly incorporate the relevant provisions of the FAA, and because the FAA contemplates an agreement to arbitrate whereas NSA arbitration is mandatory. ECF 64 at 10-14.  It is not clear why this distinction should be dispositive.  The procedure for challenging an arbitration award emanates from the nature of arbitration.  This Court has emphasized that "[t]he manner in which an action to vacate an arbitration award is made is obviously important, for the nature of the proceeding affects the burdens of the various parties [and] the rule of decision to be applied by the district court."  *O.R. Secs., Inc.*, 857 F.2d at 745.  If brought in

the form of a complaint, "the burden of dismissing the complaint would be on the party defending the arbitration award." *Id*. And "[i]f the defending party did not prevail on its motion to dismiss, the proceeding to vacate the arbitration award would develop into full scale litigation, with the attendant discovery, motions, and perhaps trial." *Id*. The policy of expedited resolution of disputes is not served by permitting a party who has lost in the arbitration process to file a new full-scale suit in federal court. *Id.* at 746.

Recognizing these principles, another district court in an NSA case has held "it was procedurally improper for Plaintiff to proceed by way of a complaint and order to show cause in seeking to vacate the arbitration award . . . . Instead, '[t]he proper procedure . . . is for the party seeking to vacate an arbitration award to file a Motion to Vacate in the district court." *GPS of New Jersey v. Aetna*, 2024 WL 414042, at *2. Similarly, FIFRA mandates arbitration, but it doesn't expressly adopt (or even mention) the FAA. 7 U.S.C. § 136a(c)(1)(F)(iii). Nonetheless, courts still apply the FAA standard when parties seek review of FIFRA arbitration awards. *Spray Drift Task Force v. Burlington Bio-Med. Corp*., 429 F. Supp. 2d 49, 50 (D.D.C. 2006).

The district court concluded these cases do not provide sufficient reasoned analysis as to why the FAA should apply in cases where arbitration is mandatory. ECF 64 at 13. But the rationale for challenging an arbitration award via a motion

to vacate relates to the efficiency and finality of the arbitration process, not to mutual consent. *O.R. Secs., Inc.*, 857 F.2d at 745-46; *see also Hall St. Assocs.*, 552 U.S. at 588 ("If parties could take full-bore legal and evidentiary appeals, arbitration would become merely a prelude to a more cumbersome and time-consuming judicial review process.").

Congress cannot have intended the hundreds of thousands of NSA IDR disputes that are initiated annually to have a pathway to full-fledged federal litigation and discovery whenever a disappointed party decides to file a complaint on information and belief. Such litigation would quickly overwhelm the court system and undermine the efficient process the NSA established for resolving these disputes. The correct method to challenge an arbitration award—including an award under the NSA—is to file a motion to vacate with supporting evidence. REACH's failure to follow this procedure is another ground to affirm the district court's dismissal of the complaint.

## VII.  CONCLUSION

For the foregoing reasons, the Court should affirm the district court's

judgment.

Dated: August 21, 2024          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By  _____*s/Moe Keshavarzi*_____
MOE KESHAVARZI
JOHN F. BURNS
MATTHEW G. HALGREN
MEGAN MCKISSON
Attorneys for Defendant and Appellee
KAISER FOUNDATION
HEALTH PLAN, INC.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the attached brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6).  I also certify that, according to the word processing program with which the brief was prepared, the brief contains 10,981 words, excluding the items exempted by Eleventh Circuit Rule 32-4, and that it therefore complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7).

Dated: August 21, 2024          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____*s/Moe Keshavarzi*_____
MOE KESHAVARZI
JOHN F. BURNS
MATTHEW G. HALGREN
MEGAN MCKISSON
Attorneys for Defendant and Appellee
KAISER FOUNDATION
HEALTH PLAN, INC.